**Affirm in part, reverse in part, and remand; Opinion Filed October 9, 2020**



In The
### Court of Appeals
### Fifth District of Texas at Dallas

No. 05-19-00159-CV

**KBIDC INVESTMENTS, LLC, Appellant**
**V.**
**ZURU TOYS INC., ZURU INC., AND ZURU LTD., TINNUS
ENTERPRISES, LLC AND JOSH MALONE, Appellees**

**On Appeal from the 219th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 219-05584-2017**

## MEMORANDUM OPINION ON MOTION FOR REHEARING
Before Justices Myers, Whitehill, and Pedersen, III
Opinion by Justice Myers

We deny appellant's motion for rehearing. On our own motion, we withdraw the opinion issued June 26, 2020. The following is now the opinion of this Court.

This case concerns a dispute between two inventors of systems for filling and sealing recreational water balloons. KBIDC Investments, LLC claims that its predecessor in interest, Kendall Harter, was the original inventor of the system used by appellees. Appellant brought suit alleging Josh Malone and his company, Tinnus Enterprises, LLC, misappropriated Harter's trade secrets, used them to

create Bunch O' Balloons, took the product to market with the help of manufacturers Zuru Inc., Zuru Ltd., and Zuru Toys Inc. (collectively, "Zuru"), and made millions of dollars. The trial court rendered summary judgment that appellant take nothing on its claims. A jury found that Malone and Tinnus's attorney's fees through trial on appellant's claim under the Texas Theft Liability Act were $194,970.

Appellant brings four issues on appeal contending (1) this Court lacks jurisdiction over this appeal because the trial court's judgment is not final; (2) the trial erred by granting appellees' motion for summary judgment because appellant presented some evidence of misappropriation; (3) the trial court erred by granting appellees' motion for summary judgment because appellant was denied the opportunity to conduct necessary and appropriate discovery; and (4) the trial court erred by awarding Malone and Tinnus their attorney's fees. We reverse the trial court's judgment that appellant take nothing from Zuru Toys Inc., and we reverse the award of appellate attorney's fees to Malone and Tinnus. In all other respects, we affirm the trial court's judgment.

## BACKGROUND

Appellant's predecessor in interest, Kendall Harter, was an inventor and entrepreneur, and he was the owner of Blue Matrix Labs. In 2010, Harter saw there were ways that the recreational activity of playing with water balloons could be improved, including by filling multiple balloons at a time and by having the

–2–

balloons seal themselves when they were full. He spent a few years developing a system. He eventually settled on using a manifold with multiple tubes on which the necks of the balloons would fit. The manifold was connected to a water source.

During the development process, Harter, who lived in Austin, worked with an engineering company in Farmers Branch, ARCO Ideas, Inc., to help develop his ideas. Those ideas included creating a water balloon filler–launcher. In March 2013, Harter created a drawing of the balloon filler–launcher and a partial prototype:



In developing the balloon filler–launcher, ARCO and Harter decided it needed a flow meter so that each balloon would be filled to a consistent level. ARCO contacted several companies, including Capstone Metering, to design a flow meter to fill multiple balloons simultaneously.

In 2013, Malone worked for a company, Realtime Group, and while working as Realtime's employee, Malone did some consulting work for Capstone. Some of Malone's work with Capstone was from his home office, and some was at Capstone's office. Malone finished his work with Capstone by January 2014.

Meanwhile, starting in 2010, Malone had been experimenting using O-rings on water balloons.[1] Malone testified that in January 2014, he had his "light bulb moment" and conceived of his system for filling and sealing many water balloons at once. The system, which he called Bunch O' Balloons, consisted of multiple narrow, straw-like tubes, with a balloon fitted over the end of the tube and an O-ring on the outside of the neck of the balloon holding the balloon on the tube. The other end of each tube fit into a cup-like device. The cup had thirty or more of these balloon-fitted tubes.

---

[1] In his deposition in this case on May 2, 2018, Malone testified that between 2010 and 2012 he did experimentation with putting O-rings on water balloons. In his deposition on August 8, 2017, in a suit against Telebrands Corp. before the Patent Trial and Appeal Board, Malone testified he did not remember whether, between 2010 and 2012, he tried sealing balloons with "rubber bands" but that he might have.



When the cup was attached to a water source, such as a garden hose, the water flowed through the tubes, filling the balloons simultaneously. As the balloons filled with water, they fell off the tubes and the O-rings sealed them.

Malone filed for a patent for the system on February 7, 2014. In July 2014, he launched a Kickstarter campaign for Bunch O' Balloons. *See* https://www.kickstarter.com/projects/bunchoballoons/bunch-o-balloons-100-water-balloons-in-less-than-1 (Kickstarter video) (last visited Oct. 8, 2020).[2] Malone advertised that Bunch O' Balloons would fill and seal over 100 water balloons in one minute. The Kickstarter campaign was a success, and Malone quickly met and then exceeded his goal.

In August 2014, Harter demonstrated in a YouTube video his version of a self-sealing, water-balloon-filling system he called the Zorbz Replicator.[3]



---

[2] During preparation of this opinion, the website address for the Kickstarter video changed. However, the website under the new address appears substantially similar to that under the previous address, and the video on the website appears to be the same as that at the former website address.

[3] The website address for this video is part of the summary judgment evidence. However, the video is no longer present at that address, and we were unable to find this video.

This system did not seal the balloons by an O-ring on the exterior but by having adhesives on the inside of the neck of the balloon and a small ball inside the balloon held in place by the specially designed neck of the balloon acting as a check valve blocking the water from escaping through the neck of the balloon.

In China, the Zuru companies, which manufacture and distribute toys, took notice of Harter's and Malone's products and began negotiations with them to manufacture and distribute the products. Harter told Zuru that Bunch O' Balloons was a design stolen from him. Zuru reached an agreement with Malone for the right to manufacture and distribute Bunch O' Balloons, but Harter refused to have Zuru sell his products. Zuru sold millions of Malone's Bunch O' Balloons products worldwide.

The success of Bunch O' Balloons led to imitation, and Malone went to court to stop other companies, including Telebrands Corp., that were copying his product, infringing his patents, and seeking to have his patents invalidated. In 2015, Harter gave a deposition and provided an affidavit in Telebrands' litigation against Malone and his company, Tinnus Enterprises.

Harter's Zorbz Replicator was less successful than Bunch O' Balloons, and Harter's company, Blue Matrix Labs, filed for bankruptcy protection. Appellant purchased the company in late 2016.

In 2017, appellant filed suit against Malone, Tinnus, and Zuru alleging Malone and Tinnus misappropriated Harter's trade secrets to develop Bunch O'

Balloons and that Zuru was aware of Malone's misappropriation when it manufactured and distributed Bunch O' Balloons.  Malone and Tinnus, and Zuru Inc. and Zuru Ltd., moved for summary judgment, asserting appellant had no evidence to support its allegations.  The trial court granted their no-evidence motions for summary judgment.

One of appellant's causes of action was that appellees were liable under the Texas Theft Liability Act (TTLA).  That statute states that the trial court shall award the prevailing party "costs and reasonable attorney's fees."  TEX. CIV. PRAC. & REM. CODE ANN. § 134.005(b).  Malone and Tinnus pleaded for attorney's fees under the statute.  Appellant demanded a jury trial on the amount and reasonableness of the attorney's fees.  The jury determined Malone and Tinnus's reasonable attorney's fees through the summary judgment on the causes of action and the trial on attorney's fees were $194,970, and the jury awarded additional amounts in the event of an appeal.  The trial court signed a final judgment incorporating the summary judgments and the jury's verdict.

## JURISDICTION

In its first issue, appellant contends this Court lacks jurisdiction over this appeal because the judgment is not final.  Appellant asserts the judgment does not dispose of one of the parties, Zuru Toys Inc.  We conclude the judgment is final and this Court has jurisdiction.

The supreme court discussed the problem of determining judgment finality in *Lehmann v. Har-Con Corp.*, 39 S.W.3d 191 (Tex. 2001):

> [T]he general rule, with a few mostly statutory exceptions, is that an appeal may be taken only from a final judgment. A judgment is final for purposes of appeal if it disposes of all pending parties and claims in the record, except as necessary to carry out the decree."
>
> . . . .
>
> [T]he language of an order or judgment *can* make it final, even though it should have been interlocutory, if that language expressly disposes of all claims and all parties. It is not enough, of course, that the order or judgment merely use the word "final". The intent to finally dispose of the case must be unequivocally expressed in the words of the order itself. But if that intent is clear from the order, then the order is final and appealable, even though the record does not provide an adequate basis for rendition of judgment.
>
> . . . .
>
> [A]n order that grants a motion for partial summary judgment is final if in fact it disposes of the only remaining issue and party in the case, even if the order does not say that it is final, indeed, even if it says it is not final. . . . Also, an order can be final and appealable when it should not be. For example, an order granting a motion for summary judgment that addressed all of the plaintiff's claims when it was filed but did not address claims timely added by amendment after the motion was filed may state unequivocally that final judgment is rendered that the plaintiff take nothing by his suit. Granting more relief than the movant is entitled to makes the order reversible, but not interlocutory.
>
> . . . .
>
> A statement like, "This judgment finally disposes of all parties and all claims and is appealable", would leave no doubt about the court's intention.

*Id.* at 195, 200, 204, 206 (Tex. 2001).

In this case, Zuru Inc. and Zuru Ltd. moved for summary judgment. The trial court signed an interlocutory order granting their motion. In the "Final Judgment," the trial court ordered that appellant's claims against "ZURU Toys, Inc., ZURU, Inc., and ZURU, Ltd., . . . are hereby dismissed with prejudice as to re-filing the same and that Plaintiff shall take nothing." The judgment also stated, "This is a Final Judgment that disposes of all parties and all claims and is appealable."

The "Final Judgment" disposes of appellant's claims against Zuru Toys Inc. by stating the claims against Zuru Toys Inc. "are hereby dismissed with prejudice . . . and that Plaintiff shall take nothing." The trial court expressed its intent that the judgment be final by stating, "This is a Final Judgment that disposes of all parties and all claims and is appealable." *See id.* at 206.

We conclude the judgment is final and that this Court has jurisdiction over this appeal. We overrule appellant's first issue.

## SUMMARY JUDGMENT

In the second issue, appellant contends the trial court erred by granting appellees' no-evidence motions for summary judgment on appellant's claims.

Rule 166a(i) provides that after an adequate time for discovery, a party "may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial." TEX. R. CIV. P. 166a(i). We review a

–10–

no-evidence summary judgment under the same legal sufficiency standard used to review a directed verdict. *See Flood v. Katz*, 294 S.W.3d 756, 762 (Tex. App.— Dallas 2009, pet. denied). Thus, we must determine whether the nonmovant produced more than a scintilla of probative evidence to raise a fact issue on the material questions presented. *See id.* at 762. When analyzing a no-evidence summary judgment, "we 'examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion.'" *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006) (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005)). A no-evidence summary judgment is improperly granted if the nonmovant presented more than a scintilla of probative evidence to raise a genuine issue of material fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). "More than a scintilla of evidence exists when the evidence 'rises to a level that would enable reasonable, fair-minded persons to differ in their conclusions.'" *Id.* (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Id.* (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

Plaintiffs often must prove trade secret misappropriation through circumstantial evidence. *Sw. Energy Prod. Co. v. Berry-Helfand*, 411 S.W.3d 581, 598 (Tex. App.—Tyler 2013) (citing *SI Handling Sys., Inc. v. Heisley*, 753 F.2d

1244, 1261 (3rd. Cir. 1985)), *rev'd on other grounds*, 491 S.W.3d 699 (Tex. 2016). "A fact issue is raised by circumstantial evidence if a reasonable person would conclude from the evidence that the existence of the fact is more reasonable than its nonexistence." *Guthrie v. Suiter*, 934 S.W.2d 820, 831 (Tex. App.—Houston [1st Dist.] 1996, no writ). "All that is required is that the circumstances point to ultimate facts sought to be established with such a degree of certainty as to make the conclusion reasonably probable." *Id.* "No fact issue is raised where the evidence is so indefinite and uncertain as to preclude a finding." *Id.* at 831–32.

In deciding whether a disputed material fact issue exists precluding summary judgment, evidence favorable to the nonmovant will be taken as true. *In re Estate of Berry*, 280 S.W.3d 478, 480 (Tex. App.—Dallas 2009, no pet.). Every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). We review a summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Dickey v. Club Corp. of Am.*, 12 S.W.3d 172, 175 (Tex. App.—Dallas 2000, pet. denied).

## MISAPPROPRIATION BY MALONE

Appellees moved for summary judgment on the ground that appellant had no evidence they had misappropriated appellant's trade secrets or other property. Appellant sued appellees for statutory and common-law misappropriation of trade secrets, violation of the TTLA, and for unfair competition by misappropriation.

–12–

Misappropriation, or unlawful appropriation, is an element of each these causes of action. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 134.002(2) (under TTLA, "'Theft' means unlawfully appropriating property . . . ."); *id.* § 134A.003, .004 (under Texas Uniform Trade Secrets Act, party may receive injunctive relief and damages for misappropriation of trade secrets); *BP Automotive, L.P. v. RML Waxahachie Dodge, L.L.C.*, 448 S.W.3d 562, 572 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (elements of unfair competition by misappropriation include the defendant used the plaintiff's product in competition with the plaintiff);[4] *Twister*

---

[4] The elements of the tort of unfair competition by misappropriation, also called "common-law misappropriation," are "(1) the creation of plaintiff's product (i.e., the trade secret information) through extensive time, labor, skill, and money; (2) the defendant's use of that product in competition with the plaintiff, thereby gaining a special advantage in that competition (i.e., a 'free ride') because defendant is burdened with little or none of the expense incurred by the plaintiff; and (3) commercial damage to the plaintiff." *BP Automotive, L.P. v. RML Waxahachie Dodge, L.L.C.*, 448 S.W.3d 562, 572 (Tex. App.—Houston [1st Dist.] 2014, no pet.). Unfair competition by misappropriation differs from common-law trade secret misappropriation in two areas: (1) trade-secret misappropriation requires the existence of a trade secret, while unfair competition by misappropriation does not require secrecy; and (2) unfair competition by misappropriation requires the misappropriated item be used in competition with its creator, while trade-secret misappropriation makes any use of the improperly acquired trade secret subject to liability. *See* James E. Hudson, *A Survey of the Texas Unfair-Competition Tort of Common-Law Misappropriation*, 50 BAYLOR L. REV. 921, 930 (1998). *Compare B.P. Automotive*, 448 S.W.3d at 572 (unfair competition by misappropriation) *with* CIV. PRAC. § 134A.002(3) (definition of "Misappropriation" in Texas Uniform Trade Secrets Act) *and Twister B.V.*, 364 S.W.3d at 437 (common-law misappropriation of trade secrets).

Appellant asserts that the tort of "unfair competition" he pleaded does not include misappropriation as an element. We disagree. The use of the product in unauthorized competition with the plaintiff who created the product is the misappropriation. *See* Hudson, 50 BAYLOR L. REV. at 930 ("common-law misappropriation requires the use of the misappropriated item in competition with its creator"); *see also Appropriate* MERRIAM-WEBSTER.COM DICTIONARY, Merriam-Webster, https://www.merriam-webster.com/dictionary/appropriate (last visited Oct. 8, 2020) ("to take or make use of without authority or right"); *Misappropriate*, MERRIAM-WEBSTER.COM DICTIONARY, Merriam-Webster, https://www.merriam-webster.com/dictionary/misappropriate (last visited Oct. 8, 2020) ("to appropriate wrongly (as by theft or embezzlement)"). Unlawful competition by misappropriation is one of multiple torts in the unfair-competition category. The tort called "unfair competition" consisting of "conduct that is contrary to honest practice in industrial or commercial matters" is a derivative tort requiring "a viable underlying tort or other illegal conduct for liability to exist." *Greenville Automatic Gas Co. v. Automatic Propane Gas & Supply, LLC*, 465 S.W.3d 778, 788 (Tex. App.—Dallas 2015, no pet.). The parties have

*B.V. v. Newton Research Partners, LP*, 364 S.W.3d 428, 437 (Tex. App.—Dallas 2012, no pet.) (elements of common-law misappropriation of trade secrets include "the trade secret was acquired through breach of a confidential relationship or was discovered by improper means" and "the defendant used the trade secret without authorization").

For Malone to have misappropriated Harter's trade secrets concerning filling multiple balloons with a manifold and using O-rings to make balloons self-sealing, he must have had some access to Harter's trade secrets and knowledge of them. *See* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40, cmt. c ("proof of the defendant's knowledge of the trade secret together with substantial similarities between the parties' products or processes may justify an inference of use by the defendant").[5] We must determine whether appellant presented any evidence that Malone had access to Harter's ideas for him to acquire knowledge of them and misappropriate them.

---

not addressed whether the tort of unfair competition by misappropriation is also a derivative tort, and we need not address that matter in this case.

[5] "Although it is unclear whether Texas expressly follows the Restatement (Third) of Unfair Competition, the Texas Supreme Court has acknowledged section 40 and other sections of this Restatement as defining trade secrets and remedies available for their protection." *Twister B.V. v. Newton Research Partners, LP*, 364 S.W.3d 428, 438 (Tex. App.—Dallas 2012, no pet.). In *Southwest Energy Production Co. v. Berry-Helfand*, 491 S.W.3d 699, 722 (Tex. 2016), the supreme court cited a case from the Fifth Circuit, *General Universal Systems, Inc. v. HAL, Inc.*, 500 F.3d 444, 450–51 (5th Cir. 2007), and observed that the case cited comment c of section 40.

## Malone's Work at Realtime Group

Appellant asserts Malone could have learned of Harter's ideas about filling multiple balloons with a manifold and using O-rings for self-sealing balloons from Harter's consultant, ARCO. From 2012 to 2014, Harter worked with ARCO to develop his ideas. Besides the balloon filler–launcher, Harter also disclosed to ARCO his ideas for self-sealing balloons and for simultaneously filling multiple balloons.

When Harter was working with ARCO, Malone worked as a product-design consultant for The Realtime Group. One of Realtime's clients was Capstone Metering, and Malone worked some at Capstone's premises. ARCO hired Capstone to design a flowmeter for Harter's balloon filler–launcher.

Thus, Harter's evidence is that ARCO had Harter's filler–launcher design, ARCO hired Capstone to design a flowmeter for it, and Malone may have been working at Capstone's premises at that time. The record contains no evidence that ARCO sent Harter's designs to Capstone or, even if it did send the design, that Malone had access to the design. Malone testified in his deposition that he was "involved" with "water meter" at Realtime and Capstone, but there is no evidence that Malone worked on the flowmeter for Harter's balloon filler–launcher. ARCO was required by its agreements with Harter to obtain nondisclosure agreements from anyone who would see Harter's designs, and there is no evidence that it did

not do so. Nor is there any evidence that Malone signed a nondisclosure agreement concerning Harter's designs.

This evidence does not make it reasonably probable that Malone had access to Harter's design. Instead it is too indefinite and uncertain to show Malone had access to Harter's design to constitute circumstantial evidence of Malone's misappropriation of the design. *See Guthrie*, 934 S.W.2d at 831.

### The Initials "JM" on ARCO's Drawings

Appellant also asserts Malone worked at ARCO and was exposed to Harter's designs while working there. Harter disclosed various ideas to ARCO, including a "Provisional Patent Application" stating that water balloons could be sealed with "[s]mall rubber bands/o-rings that are applied to the neck of the balloon after it is filled that acts as a closure to restrict the flow of liquid or gas out of the balloon opening."[6] The document also described a system of filling the balloons similar to both Harter's and Malone's systems: "This method involves a manifold distribution system that disseminates water throughout various fill nozzles, thereby distributing liquid to multiple water balloons simultaneously." Harter testified in his affidavit that in 2012, he made drawings for filling multiple water balloons at one time:

---

[6] This description is different from Bunch O' Balloons, in which the O-rings are applied to the necks of the balloons before they are filled to hold the balloons on the filler tubes.

–16–

Although the similarity of this drawing to Bunch O' Balloons is apparent, similarity of design is not evidence of misappropriation without evidence Malone knew of Harter's design. *See* RESTATEMENT § 40 cmt c.

Appellant's evidence for his assertion that Malone worked for ARCO and was exposed to Harter's ideas at ARCO is that the initials "JM" appear on drawings ARCO prepared for other products designed by Harter, including drawings for a sandwich maker and a water-balloon gun.[7] Appellant also points to Malone's Linkedin.com profile, which states that his technical skills include "CAD," computer-aided design. Appellant asserts, without citing any evidence other than Harter's affidavit, that Malone's house was "within a 30-minute drive of ARCO's offices" in Farmer's Branch. Appellant also states that ARCO had no employees with the initials "JM" at that time.

Appellant's argument that "JM" stands for Josh Malone is speculation. Appellant provides no evidence to support its theory that Malone is the only person

---

[7] This water-balloon gun appears to be a different device from the water balloon filler–launcher discussed above. Nothing in the drawing of the water-balloon gun with the initials "JM" shows the product involved self-sealing balloons of any type or that it would fill multiple water balloons at one time.

with the initials "JM" who is skilled in CAD and lives within a thirty-minute drive of ARCO's offices.

This evidence is too indefinite and uncertain to show Malone had access to Harter's designs. It does not constitute circumstantial evidence that Malone worked at ARCO, that he had access to Harter's provisional patent application or drawings, or that he misappropriated Harter's trade secrets. Furthermore, the fact that no one with the initials "JM" worked at ARCO at that time is not evidence that Malone worked for ARCO or prepared the water-balloon gun or sandwich-maker drawings for ARCO.

### Malone's E-mail with Zuru

Appellant argues that statements by Malone in an e-mail to Zuru are evidence that Malone had access to one of Harter's patent applications before it was public.

On August 15, 2014, Malone and Zuru exchanged e-mails negotiating the terms of the licensing agreement for Bunch O' Balloons. One of Zuru's concerns was the possibility of litigation with Harter's companies concerning Harter's Zorbz balloon products. Zuru proposed that half of Malone's commission be withheld and used by Zuru for any litigation concerning Zorbz. Malone wrote back stating:

> Agree to all except Zorbz indemnification. A few comments regarding that:
>
> − I understand your concern, and will help address it however I can

- we are not prepared to accept this category of risk (aggressive or frivolous legal actions)

- several statements in the warranties section address this issue, and I am happy for you to add language there

- *I urge you to compare the patent application documents to assess any risk of infringement*

- *I do not know and have never spoken to anyone who developed Zorbz IP*

- I have not been a party to any NDA or contract in this field

- *Hypothetically if Zorbz consultants gave away IP, that does not create any liabilities for us under U.S. law*

(Italicization added.) Appellant asserts that the three italicized statements constitute evidence that Malone had access to Harter's trade secrets.

Concerning Malone's statement urging Zuru "to compare the patent application documents to assess any risk of infringement," appellant argues Zuru could not have compared the patent applications without Malone having access to Harter's trade secrets and confidential information because one of Harter's patent applications was not published until February 26, 2015, six months after the August 15, 2014 e-mail.

In support of this assertion, appellant cites to Harter's patent application publication for "Self-Sealing Balloons and Related Components and Methods of Manufacturing." However, it is not clear what "patent application documents" Malone was referring to in his e-mail with Zuru. Harter's self-sealing-balloons patent application discusses making water balloons self-sealing in two ways: (1)

–19–

by inserting a small sphere into the balloon that would act as a check valve by blocking the neck of the balloon after it was filled with water and by having the neck of the balloon operate as an elastic band to hold the check-valve ball in place, and (2) by making the neck of the balloon adhesive in the presence of water. The patent application also discussed methods for manufacturing the water balloons and check valves. The patent application did not discuss any matters resembling Bunch O' Balloons, which worked by fitting balloons onto narrow tubes with the balloons self-sealing through the use of O-rings on the outside of the necks of the balloons, not adhesives inside the balloons or check valves held in place by the design of the neck of the balloon.

Harter testified in his deposition that he had "multiple" patents related to the Zorbz Replicator. If Malone was referring to the self-sealing balloon patent application, it is no evidence he had access to Harter's trade secrets concerning either filling multiple balloons at one time or making them self-sealing with O-rings because that patent application does not discuss either of those matters. If Malone was referring to a different patent application, then there is no evidence whether that patent application was unpublished on August 15, 2014.

We conclude Malone's statement to Zuru to "compare the patent applications" was too indefinite and uncertain to constitute circumstantial evidence that Malone had access to Harter's relevant designs for filling multiple water

balloons with a manifold and using O-rings to make them self-sealing or that Malone misappropriated Harter's designs.

Appellant argues in its reply brief that the second italicized statement, "I do not know and have never spoken to anyone who developed Zorbz IP," calls Malone's credibility into question. Appellant points to evidence that Malone and Harter had exchanged e-mails about Zorbz only a month before Malone's e-mail with Zuru. Appellant did not point to this statement in either its response to the motion for summary judgment or in its appellant's brief. However, even considering the statement, it is, at most, evidence that Malone lied to Zuru. It is no evidence that Malone had access to Harter's trade secrets on self-sealing water balloons with O-rings or filling multiple water balloons with a manifold. Appellant had the burden of producing some evidence that Malone misappropriated Harter's trade secrets, and the second italicized statement is not circumstantial evidence of that.

Appellant argues that the third italicized statement in the e-mail, "[h]ypothetically, if Zorbz consultants gave away IP, that does not create any liabilities for us under U.S. law," shows Malone had access to and misappropriated Harter's trade secrets. Appellant stated in the response to the motion for summary judgment: "That Mr. Malone would suggest the exact method by which he misappropriated the confidential trade secrets of Mr. Harter and Blue Matrix is telling." Appellant states in its brief on appeal that Malone's "telling choice of

–21–

language at the time strongly suggests the precise method by which he misappropriated the confidential information and trade secrets . . . ." We disagree. Appellant provided no evidence of who this hypothetical consultant was, what secrets were disclosed by or misappropriated from the consultant, or how Malone had access to the consultant or the consultant's information. We conclude Malone's statement is too indefinite and uncertain to constitute circumstantial evidence that he had access to and misappropriated any of Harter's trade secrets about self-sealing water balloons using O-rings or for filling multiple water balloons using a manifold device.

### "It's some evidence."

Appellant also points to a comment by the trial court at a hearing on the parties' motions to compel discovery and for special exceptions. Appellant argues the trial court concluded that Zuru's statement in the August 15, 2014 e-mails about wanting indemnity for potential suits by Harter was "some evidence" of Malone's misappropriation of Harter's trade secrets.

At the hearing, appellant's lawyer told the trial court that Zuru wanted an indemnification provision in the licensing agreement because Harter had told Zuru that the Bunch O' Balloons concept was "picked up from our engineers in the Dallas/Fort Worth area and was essentially a stolen idea based on the replicator concept we were working on." The following discussion then occurred:

The Court: And it's Kendall Harter who told them it was stolen.

–22–

[Appellant's Attorney]:  Yes, Your Honor, that's what it is saying.

The Court:  Because Kendall Harter thinks it was stolen.

[Appellant's Attorney]:  Yes, Your Honor.  And he's telling the—

The Court:  It wasn't that they got the thief to admit it, the purported victim claims it was stolen.

[Appellant's Attorney]: Yes, Your Honor.  And he says, I've been working on the—

The Court:  How is that evidence?  That's just a claim?

[Appellant's Attorney]:  Well, no, Your Honor, it's telling him that I was working on this.  I have my designs.  I have my other things.  I was doing this exact same thing and that this was—

The Court:  I guess I should take that back.  *It's some evidence.*

[Appellant's Attorney]:  Yes, Your Honor.

The Court:  It's not dispositive, if the accusers' own claims were evidence of their truthfulness, then nobody would need any other evidence.  They would just say you took that from me.

[Appellant's Attorney]:  Absolutely, Your, Honor, and they will have a chance at trial to rebut that; but like you said, it is some evidence.  That's all we need, it's some evidence to show—

The Court:  But you need something more than something purely self-serving.

[Appellant's Attorney]:  You don't actually, no, Your Honor, they don't have anything to rebut it, you wouldn't.  It's just—again, if it's some evidence, that's all you need.

(Emphasis added.)  In context, it appears what the trial court said was "some evidence" was Harter's statement that Malone and Zuru stole his Zorbz Replicator trade secrets.

–23–

Even if the trial court meant that the e-mail about indemnification from a potential lawsuit from Harter was "some evidence," that evidence "does not point to ultimate facts with such a degree of certainty as to make the conclusion [i.e., that Malone had access to and misappropriated Harter's designs] reasonably probable." *Guthrie*, 934 S.W.2d at 831. Therefore, it was not circumstantial evidence that Malone had access to and misappropriated Harter's trade secrets concerning making balloons self-sealing using O-rings or filling multiple balloons using a manifold.

### March 2015 Luncheon

In March 2015, Malone asked Harter to meet with him. Malone testified he was concerned that Harter may have been siding with Telebrands in that company's attempt to have Malone's patent for Bunch O' Balloons set aside.

During the luncheon meeting, Malone told Harter that Harter's patent application for self-sealing balloons (discussed above) had the wrong illustrations. Most of the illustrations in the patent application were for a sandwich maker, which had nothing to do with the text in the application. Appellant argues Malone "should not have had any knowledge, information, or even idea about the sandwich maker unless he improperly received information through ARCO—in violation of the non-disclosure agreement."

The patent application was published on February 26, 2015, and it was public information at the time of the March 2015 luncheon. Therefore, Malone's

–24–

knowledge of the patent application at the luncheon is not evidence of his having access to Harter's confidential information.

Most of the illustrations on the patent application are clearly for a sandwich maker. The illustrations include a drawing of what appears to be machine with a slice of bread and a substance labeled "Creamy Peanut Butter" in an envelope next to the bread. The illustrations also included charts stating: "Place Bread," "Start Machine," "Dispense Foodstuff," "Spread on Bread," "Present Sandwich," "Extract Sandwich," "Eat Sandwich." Malone did not need access to confidential information to discern that most of the illustrations in the patent application concerned a sandwich maker. Only four of the nineteen illustrations in the patent application appear to concern the Zorbz self-sealing balloon, which used an internal check valve with the specially designed neck of the balloon and internal adhesives to seal the balloon, not an external O-ring.

Harter also testified in his affidavit that as they were leaving the restaurant, Malone told him, "I'm going to tell your investors!" Harter testified that the identity of his company's investors "was not public and there is no way that Malone could have found out the [identity] of the investors because Blue Matrix was not a public company." Harter stated that one of the key investors received a letter signed by Malone. Malone testified in his deposition that Harter told him at the luncheon that one of his investors "was a famous third baseman for the Yankees or something. And so I think I Googled it, and then I think I further

confirmed it from public records." Malone was then asked, "What public records?" And he answered, "I don't remember. It could have been registration with the Secretary of State, but I don't remember for sure." A moment later, he said, "Now I can answer the last question. He was the assignee of record in the patent office."

Appellant argues it was factually false that the investor was the assignee for the pending patent application for self-sealing balloons. That published patent application shows the assignee is Harter's company, Blue Matrix Labs. However, Malone did not say the investor was the assignee of the patent application for self-sealing balloons; Malone said the investor "was the assignee of record in the patent office." Harter testified he had multiple patents for Zorbz water balloons; appellant did not present evidence that the investor was not "the assignee of record in the patent office" for one of Harter's other patents. Malone did not specify what the investor had been assigned, and appellant did not ask Malone what the investor had been assigned.

Even if Malone came by knowledge of the investor's identity by inappropriate means, it is too indefinite and uncertain to show that Malone came into contact with Harter's ideas for filling multiple balloons with a manifold or for making balloons self-sealing using O-rings.

## Use of Zorbz Balloons

Appellant also argues the evidence shows Malone had access to Harter's prototype self-sealing balloons later marketed under the brand name Zorbz. In the Kickstarter video, Malone shows how many Zorbz and other brands of water balloons he could fill in one minute, and he compares that to the number of Bunch O' Balloons he could fill in a minute. In the video, the Zorbz balloons are white. Appellant's summary judgment evidence included a written draft of a script for the Kickstarter video that Malone e-mailed to someone on June 25, 2014.

Appellant does not explain the link between Malone's alleged use of Zorbz prototype balloons and his alleged misappropriation of Harter's trade secrets. We will presume the argument is that if Malone had access to Harter's prototype balloons, then Malone had access to Harter's trade-secret designs.

Appellant first argues that the Zorbz balloons in the video were the prototype balloons because Zorbz balloons were not available to the public when Malone made the video. The record does not show the date on which Malone made the video. However, the Kickstarter campaign began July 22, 2014, so the video was made sometime between June 25 when Malone was working on the script and July 22, 2014. Harter testified that Zorbz balloons were sold between April and September 2014. Therefore, the fact that Malone used the balloons in June and July 2014 is not evidence they were Harter's nonpublic prototype balloons.

Appellant also argues the balloons in the video must be the prototype balloons because the balloons Malone identified as Zorbz balloons in the video were white and Harter used white balloons for his prototype. Appellant's summary judgment evidence included Malone's receipt for a package of Zorbz balloons he ordered, and the receipt included a picture of the balloon package. The picture showed the package included white balloons as well as blue, red, and yellow balloons. Therefore, the fact that the Zorbz balloons in the video were white is not evidence they were Harter's nonpublic prototype balloons.

Appellant also argues Malone had access to Harter's prototype balloons because the drafts of the script call for a voiceover stating, "We made as many water balloons as we could in 1 minute using 4 different methods. Using the old fashioned way we were able to make 6 balloons. Using a Tie-Knot, it was 8 balloons. With Zorbs [sic], we made 30." Therefore, appellant argues, Malone must have had Zorbz balloons on or before June 25 to make those claims in the script. Yet Malone's receipt for the balloons shows he ordered them on June 24 for delivery between June 26 and July 1. This evidence shows the script was written before Malone received the balloons.

Appellant's evidence included Malone's deposition. Malone testified that an initial script was provided to him, he revised it, and he sent back the script that is in the record. The e-mails show the script was sent to him on June 23, and he returned the revised script on June 25. In both scripts, the voiceover says tests of

–28–

Zorbz balloons showed thirty of them could be filled in one minute. Malone testified in his deposition that he timed filling Zorbz water balloons, but he did not testify when he did the testing other than that it was before the filming of the video. He also testified that the scripts' statements that he filled thirty Zorbz balloons in one minute were not accurate. In the actual Kickstarter video, the voiceover, which is Malone's voice, said he filled ten Zorbz balloons in one minute.

This evidence does not show Malone had access to Zorbz prototype balloons or that Malone tested any Zorbz balloons before he received those he ordered. Instead, the evidence shows Malone received and edited scripts for the Kickstarter video that stated a voiceover would say how many Zorbz balloons Malone could fill in a minute. The scripts stated thirty balloons per minute, but by the time the video was filmed and produced, which was after Malone received and could have tested the balloons, that number changed to ten. This evidence does not show that Malone had access to and misappropriated Harter's trade secrets.

Moreover, the Zorbz balloons used a different sealing system from Malone's system using O-rings, and the package of Zorbz balloons did not come with a Zorbz Replicator, which was the device for filling multiple balloons at one time. So even if Malone had received Zorbz prototype balloons, it does not tend to show that he had access to Harter's concepts for self-sealing balloons using O-rings or for filling multiple balloons using a manifold.

**"Do or Die"**

Appellant also points to Malone's comments in an interview published in D Magazine. In the interview, Malone said that before Bunch O' Balloons, his inventing "wasn't quite working out," he was "really, really discouraged," and believed this was his "last chance. It was do or die."[8] Malone also stated in his deposition that he came up with the idea for Bunch O' Balloons in a few weeks. Appellant argues: "The evidence shows that Mr. Malone's alleged creation of Bunch O' Balloons is nothing more than recasting misappropriated products he gained from KBIDC." Appellant then points to Malone's LinkedIn profile where he describes his business entity, Tinnus: "TINNUS stands for There Is Nothing New under the Sun. This describes my approach which is to find the best products, technologies, or methods and use them, improve them, or replace them." However, neither Malone's melancholy and anxiety about possibly having to give up inventing nor the name and philosophy of his company is any evidence that Malone had access to and misappropriated Harter's trade secrets concerning sealing water balloons with O-rings or filling multiple balloons with a manifold.

---

[8] Here are the relevant statements from Malone's D Magazine interview:

[Q] How many times did your wife tell you to stop fooling around with the dumb water balloon thing and get back to your old consulting job?

[A] She's been supportive. This was a really tough time. I'd spend half my time consulting, half of it inventing. It wasn't quite working out. I updated my resume and my LinkedIn, but the job openings were horrible. I couldn't imagine having to go back to the corporate world. I was just really, really discouraged. This was my last chance. It was do or die.

We conclude that none of the evidence appellant cites, whether viewed separately or collectively, constitutes evidence that Malone misappropriated trade secrets belonging to Harter and later to appellant to create Bunch O' Balloons. Therefore, the trial court did not err by granting Tinnus and Malone's motion for summary judgment.

## MISAPPROPRIATION BY ZURU INC. AND ZURU LTD.

Zuru Inc. and Zuru Ltd. moved for summary judgment on the ground that appellant had no evidence they unlawfully used, disclosed, appropriated, secured, or stole Harter's trade secrets or other property. To prevail, appellant had to present some evidence that the Zuru entities knew or had reason to know they derived their knowledge of Harter's trade secrets through a person who used improper means to acquire the trade secrets. *See* CIV. PRAC. § 134A.002(3)(B)(ii)(a).

Appellant's legal theory is that the Zuru entities received Harter's trade secrets from Malone, who had misappropriated them from Harter. To support this theory, appellant had to present some evidence that Malone misappropriated Harter's trade secrets. As discussed above, appellants failed to present any such evidence. Therefore, appellant presented no evidence that the Zuru entities unlawfully used, disclosed, appropriated, secured, or stole Harter's or appellant's trade secrets or other property.

–31–

We conclude the trial court did not err by granting Zuru Inc. and Zuru Ltd.'s motion for summary judgment.

We overrule appellant's second issue.

## SUMMARY JUDGMENT FOR ZURU TOYS INC.

Appellant also contends the trial court erred by rendering judgment for Zuru Toys Inc. Zuru Toys Inc. did not move for summary judgment with Zuru Inc. and Zuru Ltd. Instead, Zuru Inc. and Zuru Ltd.'s motion for summary judgment identified the movants as "ZURU Ltd. and ZURU Inc. (collectively 'ZURU'), incorrectly named as ZURU Toys Inc. . . . ." Even though Zuru Toys Inc. did not move for summary judgment, the final judgment states that appellant's "affirmative claims for relief asserted against Defendants . . . ZURU Toys, Inc. . . . are hereby dismissed with prejudice as to re-filing the same and that Plaintiff shall take nothing." As this Court has stated, "An order that grants summary judgment to a party who did not move for summary judgment is erroneous and must be reversed." *Mitchell v. Baylor Univ. Med. Ctr.*, 109 S.W.3d 838, 844 (Tex. App.—Dallas 2003, no pet.).

Zuru Toys Inc. filed a motion for summary judgment on the day the court signed the final judgment. A motion for summary judgment must be filed at least twenty-one days before the summary judgment hearing. TEX. R. CIV. P. 166a(c). Zuru Toys Inc.'s motion filed the day of the final judgment did not follow this requirement. Nothing in the record shows the trial court considered or ruled on

–32–

that motion for summary judgment. We conclude the trial court erred by rendering judgment that appellant take nothing from Zuru Toys Inc.

## DISCOVERY AND CONTINUANCE

In his third issue, appellant contends the trial court erred by denying its motion to compel discovery and its motion to continue the summary judgment hearing.

### Motions to Compel Discovery

Appellant filed motions to compel discovery responses against Zuru and against Malone and Tinnus on August 11, 2017, and January 25, 2018. The trial court denied the motions. "In general, a party may obtain discovery regarding any matter that is not privileged and is relevant to the subject matter of the pending action." TEX. R. CIV. P. 192.3(a).

We review a trial court's denial of a motion to compel discovery for an abuse of discretion. *Carbonara v. Tex. Stadium Corp.*, 244 S.W.3d 651, 658 (Tex. App.—Dallas 2008, no pet.). A trial court abuses its discretion when it acts "without reference to any guiding rules and principles"; in other words, if it acts arbitrarily or unreasonably. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). Even where a party shows an abuse of discretion in a discovery ruling, the complaining party must still show harm to obtain a reversal. *See* TEX. R. APP. P. 44.1(a); *see also Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 667 (Tex. 2009). Harmful error is error that "probably caused the rendition of an

–33–

improper judgment" or "probably prevented the appellant from properly presenting the case to the court of appeals." Tex. R. App. P. 44.1(a).

On appeal, appellant complains about appellees' failure to comply with its request that appellees provide copies of all communications between them. Zuru's "COO" testified in her deposition that there were hundreds of e-mails between Zuru and Malone. However, appellant states Malone produced "a handful" of e-mails with Zuru, but Zuru produced no e-mails between it and Malone. Appellant also asserts on appeal that the trial court erred by denying its motion to compel discovery concerning marketing, sales, and use of Bunch O' Balloons.

Appellant provides no argument explaining how these discovery requests were relevant to the only issue in the motion for summary judgment, whether Malone misappropriated Harter's trade secrets concerning self-sealing water balloons with O-rings and filling multiple balloons with a manifold system. Malone patented Bunch O' Balloons in February 2014. Therefore, any misappropriation of Harter's trade secrets had to have occurred before then. Appellant provides no explanation of how communications between Malone and Zuru, which began in August 2014, could be relevant to events allegedly occurring no later than February 2014.

Likewise, appellant provides no explanation of how "information related to marketing/sales/use of Bunch O' Balloons" was relevant. Appellant states in its brief that the "marketing/sales/use" information "goes directly to one of the

–34–

elements ZURU raised in its summary judgment motion." Appellant does not identify which element or provide a citation to the record. Appellant may be referring to Zuru's motion for summary judgment on appellant's unfair competition cause of action asserting, "KBIDC has not and cannot bring forth any summary judgment evidence that ZURU used KBIDC's trade secrets in competition with KBIDC." To meet this no-evidence challenge, appellant would have to show Bunch O' Balloons incorporated appellant's trade secrets and that Zuru used those trade secrets in competition with appellant. The only way appellant could show Bunch O' Balloons incorporated its trade secret was to present some evidence that Malone misappropriated Harter's trade secrets and used them to design Bunch O' Balloons. The marketing, sales, and use information by Zuru would be relevant to show whether Bunch O' Balloons was sold in competition with appellant's Zorbz products, but we fail to see how that information could be relevant to showing Bunch O' Balloons was a result of Malone misappropriating Harter's trade secrets.

We conclude appellant has failed to show how the trial court's denial of the motion to compel discovery constituted harmful error.

**Motion for Continuance**

Appellant moved for a continuance of the summary judgment hearing set for May 17, 2018, because it had not had an adequate opportunity for discovery before appellees filed their motions for summary judgment.

–35–

A party may move for no-evidence summary judgment "after adequate time for discovery." TEX. R. CIV. P. 166a(i). This rule does not require that discovery has been completed. *Specialty Retailers, Inc. v. Fuqua*, 29 S.W.3d 140, 145 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). To determine whether adequate time for discovery has passed, we examine such factors as: (1) the nature of the case; (2) the nature of evidence necessary to controvert the no-evidence motion; (3) the length of time the case was active; (4) the amount of time the no-evidence motion was on file; (5) whether the movant had requested stricter deadlines for discovery; (6) the amount of discovery already taken place; and (7) whether the discovery deadlines in place were specific or vague. *Robertson v. Sw. Bell Yellow Pages, Inc.*, 190 S.W.3d 899, 902 (Tex. App.—Dallas 2006, no pet.). A party claiming a continuance is necessary in order to conduct discovery must establish "the materiality and purpose of the discovery sought, and whether the party seeking the continuance has exercised due diligence to obtain the discovery sought." *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004).

In this case, appellant filed the suit in Travis County on January 24, 2017. The summary judgment hearing was May 17, 2018, one year, four months, and twenty-three days after appellant filed suit. Malone and Tinnus moved for summary judgment on January 19, 2018, almost five months before the summary judgment hearing. Zuru moved for summary judgment on April 16, 2018, about one month before the summary judgment hearing. The only evidentiary issues in

the motions for summary judgment were (1) whether appellant could present some evidence that Malone misappropriated Harter's trade secrets for self-sealing water balloons with O-rings and for filling multiple balloons at one time with a manifold; and (2) whether appellant could present some evidence that Zuru knew or should have known of Malone's misappropriation.

Appellant asserts discovery was delayed six months while venue was transferred from Travis County to Collin County. However, appellant cites no authority for the assertion that discovery could not occur while the case's transfer was pending. Also, the record shows some discovery occurred during this time. Appellant has not shown discovery could not have taken place while the transfer-of-venue proceedings were pending.

Appellant also sought a continuance of the summary judgment hearing to take the depositions of four individuals: Alex Stegall, Jim Williamson, Laura Jensen, and Allison Malone. However, appellant did not explain how the depositions of these four individuals were material to the issues in the motions for summary judgment. Appellant stated in its motion for continuance:

> Each of these persons has important information related to the issues raised in Defendants' motion for summary judgment. For example, Alex Stegall was the primary contact for Mr. Malone concerning his [K]ickstarter campaign, press releases, and other media publications related to Bunch O' Balloons. It is expected that Ms. Stegall will be able to verify the statements Mr. Malone made in these many media reports as well as the timeline for when certain testing, marketing, and other development of Bunch O' Balloons occurred. Likewise, Mr. Williamson was involved in the production of certain components of

the Bunch O' Balloons product in late January/early February 2014 and had communications and contacts with Mr. Malone during the relevant period concerning Bunch O' Balloons. Further, Laura Jensen participated in Mr. Malone's [K]ickstarter video, would have tested the product, and Mr. Malone has already admitted that his [K]ickstarter video falsely stated that Ms. Jensen was a neighbor. In addition, Allison Malone was listed as a person with relevant knowledge on Defendants Tinnus and Malone's disclosures, would have knowledge of the testing and development of the Bunch O' Balloons product, and was a regular participant in videos and other efforts on behalf of Mr. Malone. Her testimony will be important to show the development and testing of Bunch O' Balloons.

KBIDC believes that documents and testimony from these and other persons are necessary for the case and particularly as it relates to the element of misappropriation, which has been challenged by Defendants' motions for summary judgment. Some or all of this testimony will likely further establish evidence supporting the misappropriation of Plaintiff's trade secrets and property.

Although appellant states the witnesses' testimony "will likely further establish evidence supporting . . . misappropriation," the motion provides no explanation of how their testimony would do so. Except for Williamson, none of the witnesses appear to have been involved with appellees before Malone patented Bunch O' Balloons. Appellant's explanation to the trial court regarding the need to depose Williamson was that during January to February 2014, Williamson was "involved in the production of certain components" for Bunch O' Balloons and that he had "communications" with Malone. Although other parts of the record show this time period was immediately before Malone applied for the patent for Bunch O' Balloons, appellant did not explain in the motion the potential relevance of that time period. Appellant also did not explain how Williamson or any of the other

potential deponents would have had knowledge that Malone misappropriated the design for Bunch O' Balloons from Harter. During the hearing on the motion for continuance, appellant did not mention Williamson. Appellant also provided no explanation for its failure to depose these witnesses during the preceding sixteen months other than "Defendants' refusal to produce key documents, discovery disputes, scheduling issues for all the parties." Appellant did not explain how these matters prevented their deposing these witnesses.

As for the factors concerning discovery deadlines, there were no strict deadlines. Appellant asserts the trial court erred by not signing a discovery control plan in this case. Rule 190.1, headed "Discovery Control Plan Required," states, "Every case must be governed by a discovery control plan . . . ." TEX. R. CIV. P. 190.1 Appellant states the discovery control plan often is used as a guide to determine whether there has been an adequate time for discovery. Although appellant mentioned the lack of a discovery control plan in its motion for continuance and response to the motion for summary judgment, it did not move for the court to sign a discovery control plan. To preserve error for appellate review, a party must have made known its complaint by a request, objection, or motion that stated the grounds for the ruling the party sought, and the party must have obtained a ruling on the request, objection, or motion. TEX. R. APP. P. 33.1(a)(1). In this case, the record does not show that appellant requested or moved for the court to sign a discovery control plan. Nor does the record show appellant objected to the

lack of a discovery control plan. Even if appellant's statements about the lack of a discovery control plan constituted a request, objection, or motion, the record does not show the trial court ruled on it. Therefore, appellant failed to preserve error from the lack of a discovery control plan. *Id.*

We conclude appellant has not shown the trial court abused its discretion by denying appellant's motion for continuance.

We overrule appellant's third issue.

## ATTORNEY'S FEES

In its fourth issue, appellant contends the trial court erred by awarding Malone and Tinnus their attorney's fees. Appellant contends the trial court erred by not requiring Malone and Tinnus to segregate the fees for defending the cause of action under the TTLA from the fees related to the other causes of action. Appellant also contends the trial court erred by not submitting its requested jury instruction on segregation of attorney's fees. Appellant also contends the requested fees were excessive and not supported by legally or factually sufficient evidence. Finally, appellant contends the trial court erred by awarding Tinnus and Malone their attorney's fees incurred in the litigation over their recovery of attorney's fees.

The evidence shows Malone and Tinnus's attorneys billed them $133,310 for fees through the trial court's order granting partial summary judgment, $51,660 following the granting of the motion for summary judgment through the end of the

–40–

month before the jury trial, and their attorney testified he expected the billing for the month including the trial to be $10,000.

## Segregation of Attorney's Fees

Appellant argues Malone and Tinnus were required to segregate the fees incurred for the one cause of action where fees were recoverable by statute, the TTLA claim, from the three causes of action where fees were not recoverable, namely, violation of the Texas Uniform Trade Secrets Act,[9] common-law misappropriation of trade secrets, and unfair competition. Appellant asserts that because Malone and Tinnus did not do so, the question of attorney's fees must be remanded to the trial court. Malone and Tinnus argue that appellant's allegations in the four causes of action are practically identical, so all the work performed on the case necessarily applied to all four causes of action, and no work on the case did not apply to the TTLA claim.

Texas follows the American Rule, which provides that litigants must pay their own costs of litigation, and the costs of litigation may be shifted to another party only if specifically provided for by statute or contract. *See Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 483–84, 487 (Tex. 2019); *Epps v. Fowler*, 351 S.W.3d 862, 865 (Tex. 2011). Appellant had no contract with Malone and Tinnus. The only statute authorizing shifting attorney's

---

[9] A prevailing defendant may recover attorney's fees under the Texas Uniform Trade Secrets Act if "a claim of misappropriation is made in bad faith." CIV. PRAC. § 134A.005(1). Malone and Tinnus did not seek attorney's fees under this provision.

fees in this case is section 134.005(b) of the Civil Practice & Remedies Code, which provides, "Each person who prevails in a suit under this chapter [the TTLA] shall be awarded court costs and reasonable and necessary attorney's fees." Civ. Prac. § 134.005(b). Both appellant and Malone and Tinnus pleaded for attorney's fees under this provision. Malone and Tinnus, however, were the prevailing parties; therefore, they are entitled to recover all their "court costs and reasonable and necessary attorney's fees" concerning the TTLA claim.

Because Malone and Tinnus are allowed to recover only the attorney's fees that were reasonable and necessary for the TTLA claim, they had to segregate those fees from the fees for work that did not apply to the TTLA claim. "To the extent such services would have been incurred on a recoverable claim alone, they are not disallowed simply because they do double service" by applying to Malone and Tinnus's defense of the other three claims. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006). Merely because the facts concerning the different claims are intertwined does not mean the party seeking fees does not have to segregate the fees for the recoverable claims from the unrecoverable claims. "[I]t is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Id.* at 313–14. Thus, under *Tony Gullo*, the question is whether all the fees Malone and Tinnus incurred concerned the TTLA claim or whether some of the fees were

–42–

unrelated to the TTLA claim. If all the fees related to the TTLA claim, segregation was unnecessary, even if those fees also related to the other claims.

Appellant appears to argue that in 2017, eleven years after *Tony Gullo*, the supreme court overruled that part of *Tony Gullo* by holding segregation on a claim-by-claim basis is required in all cases, citing *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848 (Tex. 2017). In that case, Horizon sued its former employees who had gone to work for Acadia, Horizon's competitor, taking with them Horizon's confidential information. *Id.* at 857. Horizon brought claims for breach of contract and violation of the TTLA as well as numerous torts. *Id.* The breach of contract claim was based on the defendants' breaches of non-compete agreements. The TTLA claim was based on the defendants' misappropriating Horizon's trade secrets and other property. *Id.* at 883. Horizon sought to recover its attorney's fees for breach of contract and TTLA. Horizon prevailed in a jury trial on many of its claims, including TTLA and breach of contract. The jury awarded Horizon substantial damages and attorney's fees. *Id.* at 858. The supreme court concluded that no evidence supported the claim for breach of contract, but it affirmed the judgment on the TTLA claim. *Id.* at 883. Therefore, the only claim Horizon had for recovering attorney's fees was the TTLA claim. *Id.* The supreme court stated:

> When Horizon's expert testified about Horizon's attorney's fees, he segregated the fees unrelated to Horizon's breach of contract and TTLA claims, but he did not specifically delineate the fees on a

> claim-by-claim basis. Thus, we have no way to know the amount of attorney's fees relating solely to the TTLA violations. In this instance, vacating the attorney's fees award and remanding for a new trial on the issue is proper.

*Id.* at 884. Nothing in this paragraph is inconsistent with *Tony Gullo*. The breach of contract and TTLA claims were not related and did not involve the same facts; they were distinct causes of action. Therefore, Horizon had to segregate its fees relating to the breach of contract claim from the fees related to the TTLA claim. Because Horizon did not do so, the attorney's fees issue was remanded to the trial court. *Id.* The principle in *Tony Gullo* that segregation is not necessary "when discrete legal services advance both a recoverable and unrecoverable claim" is unaffected by *Horizon Health Corp. See Tony Gullo*, 212 S.W.3d at 313–14.

Appellant also cites *Transverse, L.L.C. v. Iowa Wireless Services, LLC*, No. A-10-CV-517-LY, 2020 WL 614590 (W.D. Tex. Feb. 7, 2020) (report and recommendation of United States Magistrate Judge). In that case, Transverse sued Iowa Wireless Services (IWS) over a non-disclosure agreement and supply contract, asserting claims for breach of contract, TTLA, and numerous other causes of action. *Id.* at *1. IWS prevailed, and it was entitled to its attorney's fees under the TTLA. *Id.* at *2. The magistrate ordered IWS to segregate the fees for the recoverable TTLA claim from the fees relating to the other claims. IWS refused to segregate, arguing it did not have to segregate and that it was entitled to the fees for all the claims because the claims arose out of the same facts. *Id.* at *2, *3. The

–44–

magistrate disagreed and cited numerous places where there were fees for tasks separate from the TTLA claim that IWS could have segregated. *Id.* at *4 n.2. The magistrate stated, "segregation was not an impossible task factually, as there were many approaches IWS could have taken to meet its burden." *Id.* at *4. In this case, however, appellant has not pointed out any fees that do not apply to the TTLA claim.

Malone and Tinnus's argument is that all of their attorney's fees were reasonable and necessary to their prevailing on appellant's TTLA claim. Their attorney testified to that fact. He also testified that the attorney's fees would have been the same if the TTLA claim had been the only claim. Appellant does not identify any invoice entry that did not apply to the TTLA claim.

We conclude appellant has not shown the trial court erred by awarding Malone and Tinnus their attorney's fees without requiring segregation of the fees among the different claims.

**Jury Instruction**

Appellant argues the trial court erred by refusing to submit appellant's proposed instructions pertaining to the jury question on attorney's fees. The jury question asked the jury, "What is a reasonable fee . . . for the reasonable and necessary services of Defendants' attorneys in the defense of Plaintiff's claim under the Texas Theft Liability Act?" The question instructed the jury to consider the *Arthur Andersen* factors. *See Arthur Andersen & Co. v. Perry Equip. Corp.*,

–45–

945 S.W.2d 812, 818 (Tex. 1997). Appellant asked that the jury also be instructed as follows:

> 1. The party seeking an attorney's fees award bears the burden of proving that legal work relating to claims for which fees may be recovered has been properly segregated from legal work relating to claims for which fees are not recoverable.
>
> 2. Segregation must be on a claim-by-claim basis.
>
> 3. No matter how nominal, an unrecoverable fee that does not advance a recoverable claim must be segregated from the request for attorney's fees.
>
> 4. You may not award any amount for work relating to claims for which fees are not recoverable.

(Footnotes and internal quotation marks omitted.) The trial court refused to submit these instructions.

Rule of Civil Procedure 277 requires the trial court to "submit such instructions and definitions as shall be proper to enable the jury to render a verdict." TEX. R. CIV. P. 277. "This rule . . . affords the trial court considerable discretion in deciding what instructions are necessary and proper in submitting issues to the jury." *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 451 (Tex. 1997). We review the trial court's refusal of a requested jury instruction for abuse of discretion. *Costilla v. Crown Equip. Co.*, 148 S.W.3d 736, 741 (Tex. App.—Dallas 2004, no pet.). "A trial court should submit explanatory instructions when in its sole discretion, it determines that the instructions will help the jury to understand the meaning and effect of the applicable law and presumptions."

*Depriter v. Tom Thumb Stores, Inc.*, 931 S.W.2d 627, 629 (Tex. App.—Dallas 1996, writ denied). Trial courts should refuse to submit unnecessary instructions, even if the instructions are legally correct statements. *Id.* at 630.

Appellant discusses in its brief why the instructions are legally correct statements and how it preserved its argument. However, appellant does not explain why the trial court's decision not to submit the instructions was arbitrary or unreasonable or without reference to any guiding rules or principles. *See id.* at 628–29 (defining abuse of discretion when court refuses to submit requested jury instructions). Nor does appellant explain why these instructions were necessary. Appellant cites no authority requiring trial courts to submit these instructions. We conclude appellant has not shown the trial court abused its discretion by refusing to submit the instructions.

**"Fees for Fees"**

Appellant also contends the trial court erred by awarding Malone and Tinnus their attorney's fees incurred after the court granted their motion for summary judgment because those fees were related solely to the litigation concerning the award of attorney's fees.

Appellant observes that the Supreme Court has stated, "In our legal system, *no* attorneys, regardless of whether they practice in bankruptcy, are entitled to receive fees for fee-defense litigation absent express statutory authorization." *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 133–34 (2015). We agree that

shifting the cost of litigating anything, including the recovery of attorney's fees, requires statutory or contractual authorization. But the recovery of attorney's fees for litigating attorney's fees is not per se prohibited. *See, e.g.*, *Comm'r, Immigration & Naturalization Serv. v. Jean*, 496 U.S. 154, 162–65 (1990) (under Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), party prevailing against United States entitled to attorney's fees for preparing attorney's fees application and for litigation about attorney's fees); *Saldivar v. Rodela*, 894 F. Supp. 2d 916, 939 (W.D. Tex. 2012) (under International Child Abduction Remedies Act, 22 U.S.C. § 9007(b)(3), petitioner entitled to legal fees for work preparing attorney's fees application and litigation over fees).

The TTLA provides, "Each person who prevails in a suit under this chapter shall be awarded court costs and reasonable and necessary attorney's fees." CIV. PRAC. § 134.005(b). Unlike the language before the Supreme Court in *Baker Botts*,[10] this statute contains few limitations. The only limitation is that the fees be

---

[10] *Baker Botts* concerned compensation of the attorneys representing a debtor-in-possession in bankruptcy. The statute provided that the attorneys were to be awarded "reasonable compensation for services rendered" but were not to receive compensation for "services that were not—(I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the estate." 11 U.S.C. § 330(a)(1)(A), (a)(4)(A)(ii). The attorneys represented ASARCO throughout the four years of bankruptcy proceedings. *Baker Botts*, 576 U.S. at 125. At the conclusion, Baker Botts prepared its fee application (for which it was entitled to compensation under 11 U.S.C. § 330(a)(6)), and the bankruptcy court awarded it $120 million for its work in the bankruptcy proceedings, and an additional $5 million for time spent litigating in defense of their fee applications. *Id.* The Supreme Court observed that the statute "allows 'reasonable compensation' only for '*actual, necessary services rendered*.'" *Id.* at 128. Given this language, the Supreme Court "concluded that the phrase 'reasonable compensation for services rendered' necessarily implies loyal and disinterested service in the interest of a client." *Id.* at 129 (internal punctuation omitted). "Time spent litigating a fee application against the administrator of a bankruptcy estate cannot be fairly described as 'labor performed for'—let alone 'disinterested service

"reasonable and necessary." Unlike some statutes, section 134.005 contains no limitation that the award of attorney's fees be limited to fees incurred in the defense or prosecution of the statutory claim. *Cf., e.g.*, TEX. AGRIC. CODE ANN. § 251.004(b) ("attorney's fees incurred in the defense"); TEX. ALCO. BEV. CODE ANN. § 108.80(b) ("reasonable attorney's fees incurred in the defense or prosecution of the action"); CIV. PRAC. § 62.044(b) ("reasonable attorney's fees incurred in dissolution of the writ"). Instead, the fees must be reasonable and necessary to the party "prevailing." Prevailing, under the TTLA, includes the award of attorney's fees because the award of attorney's fees is mandatory. *See* CIV. PRAC. § 134.005(b) ("Each person who prevails . . . shall be awarded . . . attorney's fees."). Thus, the attorney's fees incurred to obtain the attorney's fees award may be part of the reasonable and necessary fees for a "party who prevails in a suit under this chapter." *Id.*

In support of its argument that Malone and Tinnus may not recover their attorney's fees incurred as they pursued their right to attorney's fees, appellant cites *Austin ISD v. Manbeck*, 338 S.W.3d 147 (Tex. App.—Austin 2011), *rev'd in part on other grounds*, 381 S.W.3d 528 (Tex. 2012). In that case, the Austin Court of Appeals concluded that section 408.221(c) of the Labor Code did not permit a workers' compensation claimant seeking attorney's fees to recover the fees

---

to'—that administrator." *Id.* Section 134.005 of the Civil Practice & Remedies Code does not contain the fee limitations present in 11 U.S.C. § 330.

incurred for seeking the fees.[11]  *Id.* at 154–55.  Section 408.221(c) allows a workers' compensation claimant to recover attorney's fees from an insurance carrier when the insurance carrier seeks judicial review of certain final decisions by the administrative appeals panel.  *See* TEX. LAB. CODE ANN. § 408.221(c). However, the statute limits the claimant's recovery of attorney's fees to fees "incurred by the claimant as a result of the insurance carrier's appeal" and "only for the issues [appealed from the appeals panel] on which the claimant prevails" in the judicial review.  *Id.*  In *Manbeck*, the claimant prevailed before the appeals panel, and the insurance carrier sought judicial review.  *Manbeck*, 338 S.W.3d 149. The claimant filed a counterclaim for attorney's fees under section 408.221(c). After two-and-a-half years of litigation in the trial court, the insurance carrier nonsuited its claim for judicial review.  *Id.* at 150.  The claimant's counterclaim for attorney's fees was tried to a jury, which determined the amount of the claimant's attorney's fees both before and after the insurance carrier's nonsuit.  The court of appeals determined that the post-nonsuit fees, i.e., those incurred in seeking the claimant's attorney's fees, were not recoverable under section 408.221(c) because

---

[11] This Court and the San Antonio Court of Appeals came to the same conclusion.  *Discovery Prop. & Cas. Co. v. Tate*, 298 S.W.3d 249, 260 (Tex. App.—San Antonio 2009, pet. denied); *Twin-City Fire Ins. Co. v. Vega-Garcia*, 223 S.W.3d 762, 769–70 (Tex. App.—Dallas 2007, pet. denied).  The Houston (14th District) Court of Appeals concluded that a workers' compensation claimant could recover attorney's fees incurred in preparing for and attending the hearing on attorney's fees under Labor Code section 408.221(c), but the supreme court reversed the court of appeals' decision on the ground that the insurer was entitled to a jury trial on attorney's fees under section 408.221(c).  The supreme court did not address whether the claimant was entitled to recover the attorney's fees incurred in litigating the fees. *Transcontinental Ins. Co. v. Crump*, 274 S.W.3d 86, 103–04 (Tex. App.—Houston [14th Dist.] 2008), *rev'd on other grounds*, 330 S.W.3d 211 (Tex. 2010).

they were not incurred in prevailing on the issues on which the insurance carrier sought judicial review. *Id.* at 156. Section 134.005(b) contains no such limitation.

Appellant also argues that allowing a prevailing party to recover its attorney's fees in seeking attorney's fees "would be designed merely to spawn more satellite litigation in search for an ever expanding universe of fees for fees . . . [and] are a fertile ground for mischief and misuse of the litigation process." These concerns are dealt with by the requirement that the fees be "reasonable and necessary." If the factfinder determines that the prevailing party's attorney's fees for obtaining the fees were unnecessary or unreasonable, the factfinder may reduce the award of fees appropriately. Likewise, if the nonprevailing party uses the litigation process to increase the prevailing party's attorney's fees in seeking to be awarded its rightful attorney's fees, the factfinder may determine those additional fees were reasonable and necessary, and the trial court may award them. *See Comm'r, INS*, 496 U.S. 162–66.

We conclude the trial court did not err by awarding Malone and Tinnus their attorney's fees incurred in seeking to recover their attorney's fees under section 134.005(b).

Appellant also argues the trial court abused its discretion by refusing to submit a jury instruction that the jury may not award attorney's fees for time spent seeking an award of attorney's fees. Because we have concluded section 134.005(b) permits such an award, the requested instruction was an incorrect

–51–

statement of the law, and the trial court did not abuse its discretion by not submitting the instruction.

## Sufficiency of the Evidence

Appellant argues the trial court erred by awarding Malone and Tinnus the attorney's fees found by the jury because the fees awarded were "grossly excessive and not supported by factually or legally sufficient evidence." The reasonableness and necessity of attorney's fees "are questions of fact to be determined by the fact finder and act as limits on the amount of fees that a prevailing party can shift to the non-prevailing party." *Rohrmoos*, 578 S.W.3d at 489.

When reviewing the legal sufficiency of the evidence, we consider all the evidence before the jury, crediting evidence in support of the verdict if reasonable jurors could, and disregarding evidence contrary to the verdict unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 823, 827 (Tex. 2005); *Morris v. Wells Fargo Bank, N.A.*, 334 S.W.3d 838, 842 (Tex. App.—Dallas 2011, no pet.). If there is more than a scintilla of evidence to support the finding, the evidence is legally sufficient. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). If the evidence furnishes a reasonable basis for differing conclusions by reasonable

–52–

minds as to the existence of a vital fact, then there is legally sufficient evidence, more than a scintilla, to support the fact. *Id.*

When reviewing the factual sufficiency of the evidence, we examine all the evidence and set aside a finding only if it is so contrary to the evidence as to be clearly wrong and unjust. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998); *Cameron v. Cameron*, 158 S.W.3d 680, 683 (Tex. App.—Dallas 2005, pet. denied). In conducting our review of both the legal and factual sufficiency of the evidence, we are mindful that the jury, as fact finder, was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819; *Hinkle v. Hinkle*, 223 S.W.3d 773, 782 (Tex. App.—Dallas 2007, no pet.). We may not substitute our judgment for the fact finder's, even if we would reach a different answer on the evidence. *See Maritime Overseas Corp.*, 971 S.W.2d at 407; *Hinkle*, 223 S.W.3d at 782. A challenge to attorney's fees as being excessive is a factual sufficiency challenge to the award. *Lerma v. Border Demolition & Envtl., Inc.*, 459 S.W.3d 695, 705 (Tex. App.—El Paso 2015, pet. denied) (citing *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998) ("The standard of review for an excessive damages complaint is factual sufficiency of the evidence.")).

"[A] claimant seeking an award of attorney's fees must prove the attorney's reasonable hours worked and reasonable rate by presenting sufficient evidence to support the fee award sought." *Rohrmoos*, 578 S.W.3d at 501–02. Sufficient

evidence to support an award of attorney's fees includes, at a minimum, the following evidence: (1) the particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing the services. *Id.* at 502. The evidence must include details about the work performed. *Id.* at 505. This calculation, when supported by sufficient evidence, creates a presumption of the reasonable and necessary attorney's fees that can be shifted to the other party. *Id.* at 499.

Malone and Tinnus's lead counsel testified as their expert witness on attorney's fees. He testified to the experience of each lawyer and legal assistant working on the case, the rates charged for their work, and the reasonableness of the rates. He testified about the average rates in different parts of the state. He also testified that he and the firm's intellectual property lawyer (who had the primary relationship with Malone and Tinnus) reviewed the invoices before they were sent to "determine if the time was reasonable and necessary. Sometimes we might decide that an entry was too steep for the services that were rendered, too much time, maybe it's inefficient. Sometimes we might decide that we're just going to give the client a break for business reasons." He also testified, "We believe in our hearts and our minds that what we've written down is reasonable and fair and it's properly recorded and billed."

Malone and Tinnus offered into evidence their attorneys' redacted invoices. They also presented charts showing the division of the fees by the procedures they concerned.

Appellant argues the fees were unreasonable because Malone and Tinnus were not entitled to an award of attorney's fees for work occurring after the trial court granted their motion for summary judgment. As discussed above, Malone and Tinnus were allowed to recover attorney's fees for their attorneys' services in obtaining judgment for their attorney's fees under section 134.005(b).

Appellant also argues the fees were unreasonable because the attorneys failed to exercise billing judgment. *See El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 762 (Tex. 2012). Appellant points out that only one billing entry mentions the TTLA. However, as discussed above, all of the attorneys' work on all of the claims applied to the TTLA because the claims were essentially the same: whether Malone misappropriated Harter's trade secrets and used those trade secrets without Harter's or appellant's permission to design Bunch O' Balloons, making him millions of dollars. Thus, the fact that only one entry specifically mentions the TTLA does not show lack of billing judgment.

Appellant also asserts "there was ample evidence of overstaffing, excessive redaction that precludes a meaningful evaluation of the tasks for which Appellees' counsel seeks to be paid, duplicative or unnecessary work on which Malone/Tinnus did not pursue or prevail, and billing for administrative tasks."

Appellant cites to several pages of the invoices. However, whether these were "duplicative or unnecessary or . . . [were] billing for administrative tasks" concern whether the billings were reasonable and necessary, which was a fact question for the jury. Malone and Tinnus's expert witness testified he had inspected each of the invoices and determined that the tasks performed and the amounts billed were reasonable and necessary, so some evidence supports the jury's determination.

Concerning the argument of excessive redaction, attorney invoices are routinely redacted when offered into evidence to protect attorney–client and work-product privileges. *See In re Nat'l Lloyds Ins. Co.*, No. 13-15-00219-CV, 2015 WL 4380929, at *5 (Tex. App.—Corpus Christi–Edinburg July 14, 2015, orig. proceeding) (mem. op.), *mand. granted*, 532 S.W.3d 794 (Tex. 2017); *see also, e.g.*, *Harris Cty. App. Dist. v. Am. Multi-Cinema, Inc.*, No. 01-18-00786-CV, 2020 WL 930834, at *3 (Tex. App.—Houston [1st Dist.] Feb. 27, 2020, no pet.) (mem. op.); *In re T.R.H.*, No. 04-18-00834-CV, 2019 WL 6887143, at *1 (Tex. App.—San Antonio Dec. 18, 2019, no pet.) (mem. op.); *Tex. Mut. Ins. Co. v. DeJaynes*, 590 S.W.3d 654, 660 (Tex. App.—El Paso 2019, pet. denied). Malone and Tinnus's lead attorney testified the redactions were due to work-product and attorney–client privileges. The billing entries listed the attorney who performed the task, the date, the attorney's billing rate, the length of time to complete the task, and a description of the task except that any privileged material was redacted. The redacted material mostly consisted of the topic of the attorney's conversations with

the client or with co-counsel or the topic of certain research. Appellant does not assert that any of the material redacted was not privileged.

The supreme court has not required that parties waive their attorney–client and work-product privileges when seeking to recover attorney's fees from opposing parties. We decline to do so. Malone and Tinnus's attorneys provided a great deal of information about the fees, and their lead counsel testified and was cross-examined by opposing counsel about the invoices. We conclude that the redactions in the attorney's-fees invoices did not render the evidence insufficient to support the jury's verdict.

We conclude appellant has not shown the evidence is insufficient to support the jury's finding on attorney's fees through trial.

Appellant also argues Malone and Tinnus failed to present sufficient evidence to support the award of attorney's fees for appeal. This Court has held that when "parties were entitled to attorney's fees under section 38.001 of the Texas Civil Practice and Remedies Code for work performed at the trial court level, the trial court abused its discretion in failing to award conditional appellate attorney's fees when presented with a request for and evidence of those fees." *Scott Pelley P.C. v. Wynne*, 578 S.W.3d 694, 702 (Tex. App.—Dallas 2019, no pet.). We see no reason why that same interpretation should not apply to section 134.005(b).

To recover fees for contingent appellate services, a party must "provide opinion testimony about the services it reasonably believes will be necessary to defend the appeal and a reasonable hourly rate for those services." *Yowell v. Granite Operating Co.*, No. 18-0841, 2020 WL 2502141, at \*13 (Tex. May 15, 2020). Malone and Tinnus's expert witness did not meet this standard. He testified as follows concerning appellate attorney's fees:

> In the event that one of the parties is unhappy with what happens here, then the judgment, which happens, somebody may seek to appeal this decision to the Court of Appeals. In the event that happens, based upon my experience with appellate law, in the State of Texas in particular, and with the Fifth Court of Appeals in Dallas in particular, it's my opinion that a reasonable fee for handling an appeal to the Dallas Court of Appeals is $30,000.

> After the Dallas Court of Appeals, if it's presented in this case, and if it then turns around and enters its judgment, the parties have the right to ask our Supreme Court of Texas to review the appellate court's opinion. The Supreme Court of Texas is not required to do so in most cases. It's their discretion to do so. So you file a petition asking them to review it, and you provide information about the case. They decide whether they will hear it or not. They may reject that petition. They may grant that petition. If they grant it, that just means they're going to let you file a formal brief and perhaps come make argument to them and then they will make a decision. If they reject it, then you're back with the decision from the Court of Appeals.

> It's my opinion that a reasonable fee for preparation of the—or responding to a petition for a request to the Supreme Court to review an appellate court decision from the Court of Appeals would be $10,000. And if the Supreme Court of Texas were to say, yes, we will we'll hear your case, and we were to then brief it and present our arguments before the Supreme Court of Texas, down in Austin, then I believe that an additional fee of $25,000 for that exercise is reasonable and appropriate.

–58–

> Actually—I'm sorry. Yes, $25,000. And so that their total fees—and these others, these fees, it's my opinion that these appellate fees will be appropriate. Those that may or may not happen, but we need to establish that now so that if it does happen, you've had a chance to make a decision on what those fees will be.

This testimony does not provide the reasonable hourly rate for any of the reasonable and necessary services for the appeals process. Also, concerning the appeal to the court of appeals, it does not "provide opinion testimony about the services it reasonably believes will be necessary to defend the appeal." *Id.* Accordingly, Malone and Tinnus's evidence of appellate attorney's fees is insufficient.

We sustain appellant's fourth issue as to the award of attorney's fees for appeal, and we otherwise overrule appellant's fourth issue.

## CONCLUSION

We reverse the trial court's judgment that appellant take nothing from Zuru Toys Inc., and we reverse the award of appellate attorney's fees to Malone and Tinnus. In all other respects, we affirm the trial court's judgment. We remand the case to the trial court for further proceedings.

/Lana Myers/
LANA MYERS
JUSTICE

190159HF.P05



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

KBIDC INVESTMENTS, LLC, Appellant

No. 05-19-00159-CV      V.

ZURU TOYS INC., ZURU INC., AND ZURU LTD., TINNUS ENTERPRISES, LLC AND JOSH MALONE, Appellees

On Appeal from the 219th Judicial District Court, Collin County, Texas Trial Court Cause No. 219-05584-2017.
Opinion delivered by Justice Myers. Justices Whitehill and Pedersen, III participating.

This Court's judgment of June 26, 2020 is **VACATED**, and the following is now the judgment of this Court:

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** that portion of the trial court's judgment ordering that appellant KBIDC INVESTMENTS, LLC's claims against appellee ZURU TOYS INC. are dismissed and that appellant KBIDC INVESTMENTS, LLC take nothing on its claims against appellee ZURU TOYS INC., and we **REVERSE** the award of appellate attorney's fees to appellees TINNUS ENTERPRISES, LLC and JOSH MALONE. In all other respects, the trial court's judgment is **AFFIRMED**. We **REMAND** this cause to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that appellees ZURU INC., ZURU LTD., TINNUS ENTERPRISES, LLC AND JOSH MALONE recover their costs of this appeal from appellant KBIDC INVESTMENTS, LLC, and that appellant KBIDC INVESTMENTS, LLC recover its costs of this appeal from appellee ZURU TOYS INC.

Judgment entered this 9th day of October, 2020.